[No. 1066, June 28, 1905.]

## ANTONIO JOSEPH, Plaintiff in Error, v. THOMAS B. CATRON, Defendant in Error.

### SYLLABUS.

1. On November 22, 1873, J. signed a written agreement as follows: "Upon the confirmation by the Congress of the United States of a certain land grant known as the Cañon de Chama, otherwise called San Joaquin del Rio de Chama grant, I promise to pay E. or order, the sum of five hundred dollars in current funds of the United States;" Held, First, that a confirmation by the court of private land claims created by act of Congress approved March 3, 1891, was a "confirmation by the Congress of the United States" within the term of said agreement; Second, that a confirmation of the grant for the allotments merely, the claims as to the outlying pasture lands being rejected, was none the less a "confirmation" within the meaning of said agreement.

2. To constitute a negotiable instrument the fact of the maturity of the instrument at some time must be morally certain.

3. Tested by this rule the instrument above quoted is not a negotiable instrument since it was not certainly and at all payable, it not being morally certain that the Canon de Chama grant would ever be confirmed by Congress or through its instrumentalities.

4. The fact that the grant may as a matter of fact have been confirmed many years after the making of said instrument does not affect the rule, since the certainty of maturity must be of the date of the instrument and cannot derive support from any subsequent event.

5. A non-negotiable instrument not under seal and containing no recital of a consideration, does not import such, and to justify a recovery thereon there must be the proper allegation and proof of consideration.

6. An examination of the record fails to show any proof of a consideration for the instrument sued on. The judgment

Joseph v. Catron.

for the plaintiff was without proof to sustain it and is accordingly reversed.

Appeal from the district court of Santa Fe county, before JOHN R. McFIE, Associate Justice.  Reversed.

N. B. LAUGHLIN, for plaintiff in error.

A promissory note is a written promise to pay a certain sum of money, at a future time unconditionally.

Bouviers Law Dictionary; 1 Daniel on Nego. Instruments, 28; 3 Kent. 74; Chitty on Bills & Notes, Secs. 53-54.

If payable upon an event which is contingent, or if otherwise conditional it is not negotiable.

Story on Bills, Secs. 55 & 56.

A promissory note must be payable at all events, not dependent upon any contingency.

Cushman v. Haynes, 20 Pick. 132; Dyer v. Homer Adms. 22 Pick. 132.

It must not be payable out of any particular fund.

Creole v. Burr, 3 J. J. Marsh, 170; Story on Promissory Notes, Sec. 27; Salinas v. Wright, 11 Tex. 575; Ex-parte Tootell, 4 Ves. 372; Nunez et al., v. Dentel, 19 Wall. 560; 1 Daniel, Nego. Instruments, Secs. 41 et sec.; 4 Am. & Eng. Ency. of Law (2nd Ed.) 82; Solomon v. The Lykus, 36 Fed. 919; Cooledge v. Ruggles, 15 Mass. 387; Stanton v. Grover, 155 U. S. 513; Stanton v. Shipley, 27 Fed. 498; Allen v. Ware, 128 U. S. 590; Pym. v. C. Campbell, 6 El. & Bl. 370; Davis v. Jones, 17 C. B. 624; Wilson v. Powers, 131 Mass. 539; Pawling v. U. S. 4 Cranch, 219; Jennings v. First National Bank, 22 Pac. 777; 1 Rand. Com. Paper, Sec. 7; Carnaham v. Pell, 4 Colo. 320; Kingsbury v. Wall. 68 Ill. 311; Eldred v. Malloy, 2 Colo. 320; Baird v. Underwood, 74 Ill. 176; Chicago Ry. Eqp. Co. v. Merch. Nat. Bk. 136 U. S. 268; White v. Smith, 77 Ill. 176; Canadian Bank v. Mc-Crea, 106 Ill. 281, 289, 292; Harlow v. Bos-

Joseph v. Catron.

well, 15 Ill. 56; McCarty v. Howell, 24 Ill. 341; Bilderback v. Burlingame, 27 Ill. 338; Houghton v. Francis, 29 Ill. 244; Gabb v. King, 38 Cal. 143; Altman v. Fowler, 70 Mich. 57; Altman v. Rittershofer, 68 Mich. 287; Wright v. Traver, 73 Mich. 493; Second Nat. Bank v. Wheeler, 75 Mich. 546; Windsor Savings Bank v. McMahon, 38 Fed. 283; Hegler v. Comstock, Is. D. 138; 8 L. R. A. 393; Smith on Contracts 178; Kraak v. Fries, 18 L. R. A. 142.

CATRON & GORTNER, for defendant in error.

Notes payable "at the makers death", or "of his coming of age," etc., are negotiable, because the time must certainly come, though the date of its happening is uncertain.

Colehan v. Cook, Willis, 493; Conn. v. Thornton, 46 Ala. 587; Bristol v. Warner, 19 Conn. 9; Crider v. Shelby, 95 Fed. 212; Shaw v. Camp. 160 Ill. 428; Andrews v. Franklin, 1 Strange 22; Evans v. Underwood, 1 Wils. 262; Chitty on Bills, p. 137.

Andrews v. Franklin has been approvingly cited by the supreme court of the United States.

Chicago Ry. Eq. Co. v. Merchants' National Bk. 136; U. S. 268; 34 L. Ed. 354; Cola v. Buck, 7 Met. 588; Walker v. Woollen, 54 Ind. 164; Carlton v. Reid, 61 Iowa, 166.

As to the matter of certainty.

Gaytes v. Hibbard, 5 Biss (U. S.) 99; Stilwell v. Crary, 58 Mo. 24; Riker v. Sprague, 14 R. I. 402; Mortee v. Edwards, 20 La. An. 236.

Cases in which notes contained the condition, "payable after peace between the C. S. and the U. S."

Atcheson v. Scott, 51 Tex. 220; Knight v. McReynolds, 37 Tex. 208; Gaines v. Dorsett, 18 La. An. 563; Brewster v. Williams, 2 S. Car. 455; Nelson v. Manning, 53, Ala. 550;

Chapman v. Wacaser, 64 N. C. 533; Powers v. Manning, 154 Mass. 370.

It is now the common law, that where the payment is made to depend upon an event that is certain to come, and uncertain only in regard to the time it will take place, the note or bill is negotiable.

Curtis v. Horn, 58 N. H. 504.

### STATEMENT OF FACTS.

This is a suit instituted in the district court of Santa Fe county by defendant in error to recover the sum of five hundred dollars with interest. The second amended complaint, upon which the cause went to trial, alleges the facts practically as follows. Some time prior to November 22, 1873, being during the years 1870, 1871 or 1872, the defendant contracted, hired and employed one Samuel Ellison, an attorney at law, to present before the surveyor general of New Mexico for approval, a certain land grant known as the Canon de Chama, otherwise called San Joaquin del Rio de Chama grant, and under said employment to take proofs in behalf of said claim, and in general to initiate the proceedings requisite for the ultimate recognition of the said grant and its validity by the government of the United States of America; that thereupon said Ellison performed each and all of the things by him engaged to be done and performed in the premises, and that on November 22, 1873, in pursuance of said employment and contract, and in recognition of said services rendered, defendant did agree and promise to pay to said Ellison the sum of five hundred dollars, in current funds of the United States, upon the confirmation by the Congress of the United States of said land grant, said agreement being in writing, and being as follows, to-wit:

"Fernando de Taos, New Mexico.
"November 22, 1873.

"Upon the confirmation by the Congress of the United States of the certain land grant known as the Canon the Chama, otherwise called San Joaquin del Rio de Chama grant, I promise to pay Mr. Samuel Ellison or order,

the sum of five hundred dollars in current funds of the United States.

"ANTONIO JOSEPH,
"FREDERICK MULLER."

It is further alleged that the said Ellison did as aforesaid, earn and become entitled to receive from the defendant the said sum of five hundred dollars when it might thereafter result and happen that the said grant so by him advocated as aforesaid, should be confirmed and its validity established and recognized; that thereafter the said Ellison, before the maturity of said obligation and promise to pay, endorsed, assigned, transferred, and conveyed the said promise to pay, obligation and note of said defendant to plaintiff or his order, and the plaintiff thereupon became and is the owner and holder thereof; that after the making and delivery of said agreement by said defendant to said Ellison, the Congress of the United States enacted a statute of the United States creating and establishing a court known as the United States Court of Private Land Claims, and conferred upon said court full power and authority to investigate and determine the validity of all grants in the Territory of New Mexico including the said Canon de Chama grant; that after the creation of said court, upon petition duly presented thereto, the said court, on September 29, 1894, entered its decree confirming said grant; that thereupon petitioner prayed an appeal to the supreme court of the United States, and that upon the hearing of said appeal, at the October term, A. D., 1896, the said supreme court rendered a decision and judgment affirming the decree of confirmation previously entered by the court below; that thereafter, to-wit, on December 11, 1900, a decree correcting and amending the original decree by defining the boundaries of said grant, was entered by the court of private land claims, by which court it was ordered that said grant be surveyed with the boundaries as set forth and described; by means whereof the said grant became definitely confirmed by the decision of the said court of private land claims, and that thereby said written agreement and promise to pay became due and payable to plaintiff as the assignee of said Ellison, with interest thereon from May 24, 1897, the date of the

Joseph v. Catron.

decision of the supreme court of the United States affirming the decision of the said court of private land claims, from which said last named date plaintiff alleges that said agreement and promise to pay became due and payable. Plaintiff thereupon prays judgment upon the first count in the sum of five hundred dollars, with interest thereon at six per cent from May 24, 1897, making a total of six hundred and ninety-five dollars, and for damages in the sum of eight hundred dollars, suffered and sustained by reason of the premises, and for interest and costs.

The defendant answered admitting the execution and delivery of the instrument in question to Samuel Ellison, but denied that the said Ellison was an attorney at law, or was authorized to practice law in the courts of the Territory, and in terms denied that the defendant at any time contracted with, hired or employed, or engaged the services of said Ellison in and about said Canon de Chama grant, either to present the same before the surveyor general for New Mexico for approval, or for any other purpose, or to take proofs or initiate proceedings as to the said grant. The answer further denies that, in pursuance of said alleged agreement, defendant agreed or promised to pay to said Ellison the sum of five hundred dollars, or any other sum whatsoever, for his services touching the presentation or taking of proofs concerning said grant before said surveyor general, and denies that said Ellison ever performed any services for him or on his behalf before said surveyor general, or otherwise, in regard to the said Canon de Chama grant; but alleges that any employment of said Ellison in and about that matter, was some time prior to said November 22, 1873, by one Frank Pope and one John Ross and others, who, it is alleged, paid Ellison $333.00 in cash, in full, for his services in all matters before the said surveyor general, for which said services said Ellison gave his receipt, in full, which, however, has been lost. The answer further denies the assignment and endorsement of said note over to the plaintiff, as alleged in the complaint. It admits the allegation of the complaint as to the creation and organization of the court of private land claims; but denies that said grant was confirmed as a whole or in part as a grant, but that only the allotments

in said grant, aggregating about 1,480 acres, were confirmed by the court of private land claims and subsequently on appeal, by the supreme court of the United States. The answer further denies that by reason of said alleged confirmation of said allotments, said alleged promissory note or agreement in writing became due and payable either on May 24, 1897, or on December 11, 1900, or at any other time, and alleges that neither the terms nor conditions mentioned in the face of said note, nor those agreed upon at or prior to the time of making the same were ever fulfilled by said Ellison, or by plaintiff as assignee of said Ellison, or by any other person whomsoever, as to all of which said plaintiff had knowledge at and prior to the time said Ellison is alleged to have sold, assigned transferred said note to plaintiff. By way of new matter defendant alleges in his defense that said promissory note was delivered by him and said Muller on or about November 22, 1873, to said Samuel Ellison, under the following circumstances, conditions and considerations, to-wit: That at said date last named, or a short time prior thereto, plaintiff had become interested in and was the holder of certain interests in said Canon de Chama grant both personally and as representing others, and was negotiating for the sale of said grant with one William Blackmore: that said Blackmore and others required as a condition precedent to the sale that the said grant should be confirmed by the Congress of the United States; and to secure such confirmation of said grant defendant and Frederick Muller who signed said contract, with others who were interested in said grant, conferred with said Ellison as to the probabilities of securing its confirmation by Congress, and that said Ellison represented that he could secure such confirmation in a very short time through the efforts and influence of the then Delegate in Congress from New Mexico, and thereupon on or about said November 22nd, 1873, the said Ellison, this defendant and the said Frederick Muller, entered into a contract whereby said Ellison agreed to secure a confirmation of said grant as an entirety and according to the exterior boundaries, which included 472,736.95 acres, and said Ellison thereupon agreed that he would secure the confirmation of said

Joseph v. Catron.

grant as aforesaid, during the term of office of said Delegate in Congress, and within not to exceed two years from said November 22, 1873, upon the condition that the said defendant and said Muller would give him a note for five hundred dollars, payable to him or his order on the confirmation of the said grant within the two years aforesaid, and that it was distinctly understood and agreed between the said Ellison, the defendant and the said Muller, prior to and at the time of the signing of the said note, and as a part of the same transaction and consideration thereof, that if said grant should not be confirmed according to the exterior boundaries aforesaid, and within two years from and after the said 22nd day of November, 1873, that the said Ellison should receive nothing on said supposed note, and that the same should become null and void and of no effect at the end of the said two years, and that relying on said undertaking of the said Ellison, defendant and the said Muller signed said alleged note. It further alleges that said grant has never been confirmed in compliance with the said agreement and that by reason of the failure on the part of the said Ellison to do and perform his duties and agreements promised and undertaken by him in the manner above stated, the consideration for said note has wholly failed, and said alleged note has been ever since the expiration of the said two years, null and void and of no force and effect.

By way of reply plaintiff, while excepting to the legal sufficiency of any of the new matter set up in the answer as constituting a defense, alleges want of knowledge as to the truth of said allegations and in terms denies the same and demands strict proof thereof, if upon the hearing the court should deem such proof admissible.

The case coming on for hearing, the plaintiff, over objection, introduced in evidence the agreement set out in the pleadings. It was admitted that the signature of the defendant on said contract was genuine. The plaintiff testified that the signature of Samuel Ellison on the endorsement was genuine, having been written by said Ellison in the plaintiff's presence. Plaintiff testified that the document in question was, originally, about the year 1880, turned over to him as collateral security, for the sum of

one hundred dollars, and that thereafter plaintiff made said Ellison further advances in consideration of which the said Ellison sold, and plaintiff purchased, said note in cancellation of the indebtedness, at which time plaintiff made the endorsement on said note over Ellison's signature, and in Ellison's presence, and said Ellison handed the note to plaintiff as his property, and that no part of said note has been paid. Testimony was further offered establishing the presentation of the Canon de Chama grant to the court of private land claims and its confirmation by that court, substantially as alleged in the complaint. Plaintiff also tendered in evidence the following letter, by the defendant to plaintiff, and referring to the instrument sued on:

"Ojo Caliente, New Mexico, July 18, 1895.
"Hon T. B. Catron, Santa Fe, N. M.

"Dear Sir.—Your favor of the 12th instant, in reply to mine of previous date, is at hand and its contents have been duly noted. I have consulted with the parties that were jointly interested with me in the confirmation of the Canon de Chama grant, and who would have paid their due proportion of the note given to secure such confirmation, if the grant had been confirmed by Congress, before we sold it or within a reasonable time theerafter, and they concur with me in the opinion that the said note is not now valid, as the express condition on its face has never been fulfilled, so that we will be compelled to have litigation over it. With regards, I am,

"Yours, etc.,
"ANTONIO JOSEPH."

Plaintiff being recalled testified that his impression at the time of his transaction with Ellison, relating to the instrument in question was, that the grant in question had not been confirmed by Congress, although plaintiff at that time understood that it had been approved by the surveyor general. With this testimony plaintiff rested his case, and defendant thereupon moved the court for judgment in his favor upon the grounds, *first,* that plain-had failed to show any valid contract under which the defendant could be held liable, *second,* that the plaintiff had failed to show that any consideration was paid or deliv-

ered to the defendant or moved in any way from the plaintiff or his alleged assignor for the making of the alleged contract introduced in evidence, *third,* that plaintiff had failed to show that the contingency, to-wit, the confirmation by Congress of the Canon the Chama grant has ever occurred. This motion being denied, defendant proceeded to his proof. Plaintiff being called as a witness on behalf of the defendant, testified that the original petition for the approval of the Canon de Chama grant by the surveyor general of New Mexico had been written by plaintiff and the name of Ellison signed thereto by plaintiff upon Mr. Ellison's request, but not under any employment, and that the petition was drawn between the years 1869 and 1871. Defendant further tendered in evidence the decision of the surveyor general approving this grant, dated December 17, 1872, and transmitted to Congress January 29, 1873, and the supplemental report of the surveyor general dated June 28, 1886, and transmitted to Congress, June 30, 1886, which documents were, upon objection of plaintiff, held to be immaterial and irrelevant. The defendant called as a witness testified, that the document in question was given to Ellison in consideration of his securing the confirmation of the Canon de Chama grant, as approved by the surveyor general, within the term of office of Mr. Elkins in Congress; that said Ellison represented that he could secure the confirmation of said grant, as thus approved, through Mr. Elkins, and within the term of the latter as Delegate in Congress, and that defendant having in the meantime entered into an agreement with one Henry Blackmore to secure the confirmation of this grant for a consideration, and being influenced by the representation of Ellison, that he could secure the confirmation of this grant through Mr. Elkins, defendant gave Ellison this note or document, it being understood between them that the note was a conditional one upon the confirmation by Congress of this grant within the time stipulated, and if not confirmed within that time then this document was to be null and void. Defendant denies ever having employed Ellison at any time to appear on his behalf before the surveyor general for the approval of said grant, or that he ever had any conversation with

Ellison to that effect, but that on the contrary, defendant never had any interest whatever in said grant until the 16th day of December, 1873, up to which time Ellison had already rendered services in that matter, but for other parties, to-wit, one Georgus Pope, commonly called Frank Pope; that said Frank Pope paid said Ellison for such services before the surveyor general in the approval of said grant the sum of $333.00, said amount having been paid upon the sale of the property by defendant himself to Ellison pursuant to defendant's arrangement with said Georgus Pope, this payment being made about the year 1873 or 1874. Defendant further testified that he never at any time, either prior or subsequent to November 22, 1873, agreed to pay Ellison anything or any sum of money for any services to be performed by him before the surveyor general with reference to the Canon de Chama grant, except the sum of $333.00 which was paid him out of money in the possession of the defendant, received by him from William Blackmore for the interest in the grant that he transferred at that time, which money was due Georgus Pope and was paid to Ellison on Pope's account. Defendant admitted on cross-examination having written the following letter to the widow of Samuel Ellison:

"House of Representatives,

"Washington, D. C., Dec. 15, 1891.

"Mrs. F. S. Ellison, Santa Fe, N. M.

"Dear Madam:—I acknowledge the receipt of your very esteemed letter dated the 10th inst., and, advised of its contents, proceed to inform you, that if you have the obligation mentioned, I will pay you the sum of two hundred dollars for it; but a receipt does not annul the original obligation; there has already happened to me one difficulty of this nature in the courts and I do not wish to have it occur again. Get the obligation and it will be paid. With great respect, I am your friend and servant.

"A. JOSEPH."

Defendant explained that this letter was written, however, by way of compromise, although denying the liability, in order that he might secure and destroy the paper, that was out against him, but that the amount mentioned in that letter was never paid for the reason that plaintiff

Joseph v. Catron.

who had possession of the note declined to give it up. Defendant also presented testimony showing that the area included in the Canon de Chama grant, was finally confirmed by the court of private land claims, was 1,422.62 acres, and that said grant so confirmed was, about the year 1900 sold for $625.00. There was also offered in evidence the complaint, answer and decree in a certain proceeding in the district court affecting this grant, a recital of the contents of which does not seem here material. Defendant also tendered in evidence, in connection with his testimony, a receipt signed by Georgus Pope, dated September, 1873, in which it is stipulated that the defendant is "to pay to Mr. S. Ellison $333.00;" also a statement of account relating to the sale of this grant about 1873, made by or in the presence of the defendant, whereupon is an endorsement $333.00 S. E. Fees" and which it was explained referred to the amount defendant was to pay, being the amount due him by Pope and which defendant assumed under the receipt last referred to. Defendant also presented a letter written by said Blackmore, dated November 25, 1873, in which there is a direction to defendant to "obtain the release of Mr. Ellisons' claim;" and also an agreement of June 14, 1873, between defendant and William Blackmore, relating to the terms of the sale of said grant, which last, however, contains no reference to the Ellison matter. This was all the testimony presented on behalf of the defendant.

At the conclusion of the testimony plaintiff moved to strike out all of the documentary evidence introduced by the defendant as being immaterial, irrelevant, and incompetent and as being *res inter alios acta,* and hearsay and also moved to strike out all the testimony of the defendant as being irrelevant, incompetent and improper, and as incapable of varying, modifying or affecting the instrument sued on, and because the same is not corroborated, and because the same is offered against the assignee of a deceased person, and because the same seeks to vary the written instrument herein sued on; and plaintiff further moved to strike out all of the testimony presented on behalf of the defendant as being likewise immaterial,

irrelevant and incompetent, which motions and objections were sustained.

The effect of this holding of the court was to leave the case for determination upon the testimony presented by the plaintiff, as above outlined, and the court thereupon entered its findings in favor of the plaintiff, holding the instrument sued on to be a negotiable instrument in the hands of a *bona fide* purchaser, for value, without notice of any defense which might have existed thereto in the hands of the said Ellison; that the same imported a, consideration upon its face and was made for a valuable consideration; that the period of maturity mentioned therein was morally certain to happen, and that said instrument was certain to mature; that the confirmation by the Congress of the United States of said grant was within the meaning of said contract, a confirmation of the same by the court of private land claims created by Congress as its agency in the premises, and that by the confirmation of said grant on December 11, 1900, said obligation matured, the same being a confirmation in law by the Congress of the United States.

A motion for a new trial was made and overruled, and judgment was accordingly entered in favor of the plaintiff and against the defendant in the sum of $615.00; whereupon defendant sued out a writ of error from this court.

## OPINION OF THE COURT.

POPE, J.—The assignments of error filed by the defendant set forth that the court erred in finding for the plaintiff on the testimony presented, and in sustaining the objection to the testimony presented for the defense, and also in its rulings upon the admissibility of the testimony presented on the hearing.

The first question which it becomes necessary to determine is, whether upon the testimony presented, plaintiff was entitled to recover, and this in turn involves a number of subsidiary questions, among others, the construction of the contract here sued on. This contract is as follows:

"Fernando de Taos, New Mexico, November 22, 1873.

"Upon the confirmation by the Congress of the United States of that certain land grant known as the Canon de Chama, otherwise called San Joaquin del Rio de Chama grant, I promise to pay Mr. Samuel Ellison or order the sum of five hundred dollars in current funds of the United States.

"ANTONIO JOSEPH,

"FREDERICK MULLER,"

It is alleged on behalf of the defendant that the time of maturity upon which this contract is based has never arrived for the reason, *first,* that that grant has never been confirmed by the court of private land claims, but that only certain allotments therein contained have been confirmed, and *second,* that even if confirmed by the court of private land claims such a confirmation was not a confirmation by the Congress of the United States as provided in the instrument sued on. We are of the opinion that neither of these positions is well taken. As to the first, while it is true that the confirmation by the court of private land claims restricted the area of the grant to about 1,420 acres composed of agricultural allotments as against almost a half million acres claimed, composed of these allotments and a vast outlying tract suitable only for pasturage and similar purposes, still the action of the court of private land claims, as embodied in its decree, was no less for that reason a confirmation of the grant. The grant as confirmed by the court of private land claims must be assumed to be the grant as it always existed, and even if confirmed by the court, with an extremely reduced area, was none the less confirmed. We are of the opinion further that a confirmation by that court was within the terms of this contract as being a confirmation by Congress. The United States has adopted at various times different methods of dealing with private land claims; in some instances as in California confiding the determination of such matters to a commission vested with more or less restricted powers; in other cases, as in the grant here under consideration, confiding the matter to a court vested, as was the court of private land claims, with power to hear and determine cases upon the principles of equity; and in still other cases, Congress dealt direct

with the matter, confirming a claim by direct Congressional act upon the report of its own committees, instead of by delegating that power to courts specially designated for that purpose. But whether the one method or the other was adopted, the confirmation after all was by Congress, in that the power to deal with the subject matter came directly by act of Congress, and without such act no power would have existed. The adjustment of these claims upon the national conscience was essentially a political act and that Congress in the performance of such act may have enlisted the assistance of a judicial tribunal especially created by it for that purpose cannot be taken as detracting to any extent from the fact that such a confirmation was due to the act of Congress and directly flowed from such Congressional action. The determination of such matters by the court of private land claims was simply a determination of the issues of law and fact which would otherwise have been dealt with and reported upon by proper committees of Congress; and after the determination of the matter by the court of private land claims the patent evidencing the quit claim of the government was issued under the direction of the land department just as in cases of Congressional confirmation. We are of opinion that the fact that Congress may have been in some instances more liberal in dealing with these private land claims than commissions or courts created by it, cannot be considered as a circumstance affecting the construction of this contract. It cannot be assumed that in making this contract the parties were stipulating to secure from Congress more than they were justly entitled to. It must be assumed that the decree of confirmation rendered by the court of private land claims, and affirmed by the supreme court of the United States, gave the owners all they were justly entitled to. As presumably all the claimants sought was what was due them, and as presumably that is all they would obtain whether the matter was dealt with by Congress or by one of its courts, the difference in tribunal cannot be assumed to have entered into the making of the contract. We accordingly hold that the purpose of this contract was the payment of the amount named upon the confirmation of the grant, whether by

Joseph v. Catron.

act of Congress specially applicable to this grant, or by act of Congress providing for the submission of this and other grants to a competent tribunal, which after due investigation might grant a confirmation.

We come now to consider the third proposition to which the briefs of counsel and the oral argument have been mainly directed. Is the instrument here sued on a negotiable instrument? If it is such an instrument then it is presumed to have been given upon valuable consideration, and having been acquired before maturity by a *bona fide* purchaser, for value, and could not be subject to any defences existing between the original parties, of which plaintiff had no notice. If on the other hand the instrument was not negotiable, very different questions supervene.

The rule is recognized by each of the parties that in order to constitute a negotiable instrument the fact of the maturity of the instrument at some time must be morally assured, it must be certain to accrue. It is contended by the defendant on the one hand, that the wording of the instrument "upon the confirmation by the Congress of the United States" of the grant in question, was plainly a condition which might or might not be attained, and that thus the maturity of the instrument in question was based upon a condition which might or might not finally accrue; and that thus whatever may be the dignity of this instrument as a contract, it lacks an essential element of negotiability, to-wit, certainty of maturity. On the other hand, it is contended by the plaintiff that the confirmation of this grant by Congress was morally certain, in that it depended upon the performance of a governmental duty, and that while the time of such confirmation was indefinite, there was at the time of the making of this contract and at every moment subsequent a moral certainty that Congress would at some time perform this duty of confirming to one of its citizens the title to this grant. The cases bearing upon this precise point are not numerous, and those cited by the parties in their briefs are, as a rule, not in point. Thus the line of cases holding that notes payable "at the maker's death" are negotiable, are not in point for the obvious reason that death is an absolute cer-

tainty and a note contingent upon a death is thus contingent upon something which is bound to occur. Equally as apart from this proposition are the cases relied upon by plaintiff known as the "Southern War cases," involving questions as to the negotiability of notes payable within a certain time after the cessation of war between the Confederate States and the United States of America, or the establishment of peace between those then contending portions of our re-united nation. Such obligations were likewise contingent upon an event which was morally certain to happen. In human experience no war has ever existed which has not come to an end, and none can be conceived of that will not have at some time a termination. The limitations of human endurance, physical and financial, absolutely negative the idea that there can be any war which shall not cease. In each of these two classes of cases cited by counsel, there existed, therefore, a moral certainty of the maturity of notes. But does the confirmation of a land grant by Congress stand upon the same basis? It is urged by the plaintiff that it does for the reason pointed out in one or two English cases of great antiquity. The first of these is the case of Andrews v. Franklin, 1 Strange, 22, wherein the condition of the note was "payable two months after a certain ship of His Majesty's service should be paid off." This note was objected to as depending upon a contingency which might never happen, but the court held otherwise upon the ground that the "paying off of a ship" is a thing of public nature. Also there is cited the case of Evans v. Underwood, 1 Wils. 262, wherein a note was held negotiable, the terms of which were "I promise to pay to George Pratt or order, eight pounds, upon the receipt of his, the said George Pratt's wages due from his Majesty's ship, the Suffolk." In that case the court contented itself with citing and following the case of Andrews v. Franklin. We have been referred to no American cases in which the doctrine of Andrews v. Franklin has been followed or indeed countenanced. The case of Chicago, etc., Co. v. Merchants National Bank, 136 U. S. 268, it is true, cites this case but the question there involved was a very different one from that ruled in Andrews v. Franklin. On the other

Joseph v. Catron.

hand, wherever these two cases have been cited by the text writers or the reports, it has been to question their soundness. Indeed, doubts have even been expressed as to whether Andrews v. Franklin was ever actually decided, and Evans v. Underwood has been particularly criticized upon the ground that while the paying off of a public ship may be a moral certainty it is by no means to be considered equally certain that a particular person will receive wages thereupon. For reference to these cases see 1 Dan. Neg. Inst. Sec. 46; Story on Prom. Notes, Sec. 27; Chitty on Bills, p. 137; Bayley on Bills, p. 26; Weidler v. Kauffman 14 O. S. 456.

We need not here discuss the fact that the English cases were decided under a system of government, one of whose fundamental principles is that the King can do no wrong, and we would be slow to hold that republics, however proverbially ungrateful, are less mindful of the fulfillment of their obligations than monarchies. We do not understand, however, that the two cases cited turn upon the presumption that every nation performs its duty, because it should do so, for that presumption in a certain sense exists as well in the case of the individual as the nation, and if considered as explanatory of the holding in these cases would make all obligations contingent upon the performance by any one of a just obligation, a negotiable instrument. We conceive these cases, however, to be founded upon the fact that the very operation of government leads automatically to the payment of its ships from time to time. This is a custom which if not as fixed as the recurrence of the seasons is at least as stable as the existence of the government itself. The payment of its sailors is a matter of such national and imperative concern and so invariable in the past that a promise contingent upon such a payment in the future may well be considered based upon a moral certainty. This at least is explanatory of Andrews v. Franklin. We find ourselves amply justified by the authorities above cited in saying that Evans v. Underwood does not follow from Andrews v. Franklin, in that the latter refers to a general and universal custom and the other to the payment of an individual, which for various reasons might never occur. But

indulging to these two cases the high respect which must be accorded them, both because of their age and the high character of the English tribunal enunciating them, we are of opinion that they do not lead to the conclusion that the confirmation of a land grant by Congress is a moral certainty. The United States has never become bound by treaty nor by international law to the confirmation of all private land claims in the Territory of New Mexico nor for the confirmation of all claims, which may be asserted by interested parties to be land grants. The extent to which the nation went in the treaty of Guadalupe Hidalgo, was to pledge itself that in the territories conveyed by the treaty, property of every kind should be inviolably respected. This was simply a declaration of international morals. But the manner of that recognition in the case of an imperfect grant—and plaintiffs in their brief concede and, contend that this was such—was exclusively for Congress to determine. In Territory v. Delinquent Tax List, etc., 76 Pac. 316, this court has heretofore had occasion to consider the subject of imperfect grants and to point out upon a full citation of authorities that an imperfect grant is one "the title to which was at the date of the treaty rested in the United States," it is one "which does not convey full and absolute dominion," it is one which requires "a further exercise of the granting power to pass the fee in the land," it is one "which may be confirmed or disallowed by the political or granting powers," it is one "depending for its completion and sanction upon the sovereign power and to this course claimant had no just cause to object as their condition was the same under the Spanish government." An imperfect grant thus depends for its recognition solely upon the grace of the new sovereign and the manner of its recognition by the sovereign is purely conjectural. Congress is not bound either by treaty or by morals to confirm it. Other methods of satisfying the national obligation may be employed. The freedom of Congress to deal with imperfect grants, as its pleases, is illustrated in the act of March 3, 1891 (26 Stat. 854) establishing the court of private land claims wherein it provided that no imperfect grant no matter what may be its area by natural boundaries, shall be

confirmed for more than eleven square leagues; and where-
in it is further provided (Sec. 12) that any imperfect
grant not presented within two years shall be taken and
deemed in all courts and elsewhere to be abandoned and
shall be forever barred.  The power thus given to restrict
the area of the grant, indeed to declare the grant of no
effect unless presented within a given time, is illustrative
of the power to deny confirmation entirely, of the power
to provide by other means for the satisfaction of the claim
upon the national conscience.  And that is exactly what
was done in the case of the well known Luis Maria Cabeza de
Baca grant in this Territory which was satisfied by Con-
gress, not by giving the claimants the land covered by the
grant, but by providing (12 Stat. at Large 71; 13 St. at
Large 125) for an equivalent amount of land located in
other sections of the West and now familiarly known as
the Baca floats.  It is entirely conceivable that Congress
might in other instances satisfy, might indeed in the case
of this very grant, have satisfied the claim upon the na-
tional conscience by the retention of the land by the gov-
ernment and the payment of an adequate amount of money
to satisfy what Congress might deem to be the equities of
the case.  This likewise is illustrated by the land court
act wherein it is provided that where portions of the grant
have been taken up under the public land laws, claimants
shall have no confirmation for the particular land but must
accept in lieu thereof a dollar and a quarter an acre.  It
follows from the foregoing therefore, that at the time
the contract was made it was not morally certain that
this grant would ever be confirmed.  Indulging in its be-
half all that has been said by plaintiff as to its merits
as a private land claim, contentions to a limited extent
recognized by the court of private land claims, it was with-
in the right of the nation, it was entirely possible for Con-
gress to decline to confirm, it was entirely possible that it
would settle the claim by the assignment of lieu lands or
the appropriation of a stated sum.  The presence of these
possibilities establish that at the time this obligation
was made, a confirmaton was *not* bound to occur, it
was not a moral certainty, the instrument 'was not
payable at a time fixed beyond peradventure, the instru-

ment was not negotiable. The conclusion here reached is readily vindicated by another line of reasoning. Assuming as we must a readiness upon the part of the government to satisfy its obligation when known, there is a certain class of these that it cannot know or provide for unless they be presented by those who hold them. To this class belong what are known as private land claims, Indian depredation claims, pension claims, customs refunds, and a score of other classes of obligations which unless presented would never be known to the governmental authorities. For these, unlike the payment of English sailors or our own sailors for that matter, there is no monthly or quarterly pay day. Theoretically, the government has in mind and intent the ultimate settlement of all its obligations, liquidated and unliquidated, contractual and noncontractual. Practically until those of the description above enumerated are presented and prosecuted there is no possibility of payment and in a machinery as vast as a government, this must necessarily be so. In matters such as private land claims, it cannot undertake to hunt out the claimants. It simply helps those who help themselves. As to the confirmation in recognition of these there is from a human standpoint no element of predestination. The principle of free agency on the part of the claimant has full sway. If he proceed on the assumption that what is to be will be, whether he assist to that end or not, he will soon find that little headway is made. Applying this statement of truisms to the case at bar, if at the making of the instrument of Nov. 22, 1873, the condition therein expressed was morally certain to accrue, it was morally certain for all purposes and as to all persons. Suppose now the claimants of the Canon de Chama grant relying upon this "moral certainty" and refusing to take any steps in the matter had simply allowed the matter of the confirmation to await the fruition of that certainty, the outcome of that predestined fate, what would have been the status of this obligation at the present time, what its status when sued on in 1903? The answer is, that the grant not having been presented to the court of private land claims on or before March 3, 1893, would under the provisions of Section 12 of the land court act, already

referred to, be "deemed and taken in all courts and elsewhere to be abandoned and forever barred," and the condition named in the note would thus have become forever impossible of fulfillment and the note itself forever incapable of maturity. But if this condition could result from a default by the owners of the grant what becomes of the moral certainty of maturity which inheres in and constitutes a negotiable instrument? If maturity may as in this case be rendered impossible of fulfillment, the fundamental idea of a negotiable instrument, that its time of payment must be fixed and beyond the control of the parties or any third party, fails. When it is reflected further that even if the grant owner had waived the alleged moral certainty which attached to the confirmation of his claim and had filed it seasonably before the land court, its confirmation still depended upon the presentation of proper proofs, the vigilance of counsel and the other elements always entering into the success of matters in litigation, it will be seen that the instrument when made in 1873 depending upon a confirmation by Congress, was confronted by a number of contingencies, any one of which might have prevented the realization of the condition upon which maturity was predicated, and was accordingly not negotiable. It is no answer to these positions to show that the grant in question has as a matter of fact been confirmed by the court of private land claims, The fact that Congress may have decided to confirm the grant through the instrumentality of the land court instead of to satisfy its equities in some other way, does not detract by relation from the fact that when the instrument was signed it was possible that Congress might provide otherwise. The fact that the claim may when presented to the land court, have successfully run the gauntlet and emerged, clothed in a three hundredth of its claimed area, does not detract from the fact that in 1873 it was entirely possible that it might never have been presented to and prosecuted in that or any other court and might thus within the discretion of Congress have become "abandoned and forever barred." The question is what were the conditions when the contract was made. Negotiability is to be judged by the front

Joseph v. Catron.

sight; not by the back sight. The moral certainty must be present at the time of its execution and not be a matter of relation accruing by reason of subsequent events.

4 If it be not a bill or note *ab initio,* no subsequent event can make it so. Bayling on Bills (5th Ed.) C. 1, Sec. 6, p. 16. The character of an instrument as a promissory note cannot depend upon future events, but solely upon its character when created. Ernest v. Stockman, 74 Pa. St. 15; Eldred v. Maley, 2 Colo. 320; Story on Prom. Notes, Sec. 22.

For the reasons stated we are of opinion that the instrument sued on was not a negotiable instrument but was simply a contract to pay upon a contingency which might or might not happen.

It follows from this conclusion that the burden was upon the plaintiff especially in view of the pleadings which make an issue upon the subject of considera-

5 tion, to prove a consideration for the contract made by defendant and Muller with Ellison. A written agreement such as this does not import a consideration. A valid consideration must be alleged and proved. Chitty on Bills pp. 8, 9; Daniels on Neg. Inst. Sec. 160, et seq.; Shelton v. Burer, 8 Yerg. 24; Jerome v. Whitney, 7 John, 322; Edgerton v. Edgerton, 8 Conn. 6.

We have carefully examined the record upon this point and fail to find any testimony to sustain the finding of the court, that there was a sufficient consid-

6 eration for the note in question. Plaintiff in his brief argues that the letter of June 18, 1895, from defendant to plaintiff, above quoted, admits the giving of the note, and that the same was for a sufficient consideration. We do not so construe that letter. It in terms denies the validity of the intrument upon the ground that the express condition, to-wit, confirmation by Congress, has never been fulfilled, and asserts that there will have to be litigation over it. We do not think that the denial of liability on this one ground is in effect an admission of a valuable consideration for the instrument in question. It is further urged by plaintiff that the letter heretofore referred to from the defendant to Mrs. Ellison, offering to pay $200.00 is likewise an ad-

mission of a sufficient consideration. That letter was in terms admitted as a part of defendant's case, and was under the objection of counsel for plaintiff, to go out, should the rest of defendant's testimony be stricken out. This having been done, the letter is not evidence before us. If this letter, however, is to be considered a part of the record, the explanation accompanying it must likewise be considered and defendant testified explicitly that the letter was an offer by way of compromise in order to secure and retire an outstanding paper bearing his name. It is finally contended by plaintiff that defendant's answer admits a valid consideration, to-wit, the retainer of the services of said Ellison. Even if this allegation of the answer can for this purpose be segregated from the remaining allegations which are designed to establish an entire failure of the consideration alleged, the consideration which it avers cannot avail plaintiff for the reason that it does not accord with the allegations of his complaint, which are to the effect that the document in question was given in consideration of past services rendered by Ellison before the surveyor general, whereas defendant's allegation is that it was in consideration of services thereafter to be rendered, presumably before Congress, since the surveyor general had in the January proceeding disposed of the grant by a favorable report to the Department of the Interior. In addition these very averments of the answer, upon which plaintiff now relies to establish consideration are put in issue by his reply. He cannot recover upon a theory which is entirely different from that which he alleges and which is denied by his own pleadings. We therefore, conclude that there is no proof in the record establishing a consideration for this contract, that in this respect plaintiff failed to make out his case, and the court erred in giving judgment in his favor upon the proofs.

Holding as we do, that the plaintiff is not entitled to a recovery upon his testimony, and reversing the case upon that ground, we do not find it necessary to determine to what extent the testimony presented on behalf of the defendant was admissible. The case having been tried by the court below upon the theory that the instrument

sued on was a negotiable instrument, it naturally resulted that the same weight was not given to the testimony for the defense that would have been given otherwise. Holding as we do, that the instrument sued on was not negotiable, the case is open for all defenses that would have been available between the original parties, and we deem it fairer to remand the case for the purpose of admitting such proof as may be offered by either side. Of course, no testimony can be received upon the new trial as to oral agreements contemporaneous with or prior to the instrument here sued on, contradictory of the terms thereof; and, of course, in the further trial of this case, no testimony of the defendant "in respect of any matter occurring before the death of the deceased person" can justify a decision in his favor "unless such evidence is corroborated by some other material evidence." (C. L. Section 3021), and, of course, further, such corroboration must be upon the point or points in issue in the case necessary to a recovery. Gillett v. Chaves, (N. M.) 78 Pac. 68 and cases cited.

The case will be reversed and remanded for further proceedings in accordance with this opinion.

William J. Mills, C. J., Frank W. Parker, A. J., Ira A. Abbott, A. J., Edward A. Mann, A. J., concur.

McFie, A. J., having decided the case in the court below took no part in this decision.